# Exhibit A

Location: Fairview Heights, IL
Entity No.: 60243
Unit No.: 345

## RAMADA WORLDWIDE INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated MARCH 10, 200 6, is between RAMADA WORLDWIDE INC., a Delaware corporation ("we", "our" or "us"), and FAIRVIEW HOSPITALITY, LLC, a Missouri limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to FAIRVIEW HEIGHTS HOTEL PARTNERS L.P., ("Prior Licensee") in a License Agreement with us dated October 12, 1992 (the "Prior Agreement"). You acknowledge that we may require you or your staff to complete training on the use of a property management or similar computer system for accessing the Reservation System and pay our retraining fee.

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Ramada Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term, **except for the restaurant (which is currently a TGI Friday's franchise) and the 2nd Floor Lounge (which is currently a Funny Bone Comedy Club).**

**2. Ramada Inns National Association.**

2.1 **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2 **RINA Conference.** You or your representative will attend each RINA Conference when it is held. You will pay not less than one "Conference Registration Fee" for each Facility you own. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

RAMEXC1
183636.4 Q3/05



**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 200 or fewer points (or equivalent scores under a successor quality assurance scoring system we employ), within ninety (90) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Opening.** You may continue to identify the Facility under the System while you perform the Improvement Obligation, if any.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept

2

payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You will participate in any regional management association ("RMA") of Chain licensees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area. You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied.

3.6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including arrangements we make with third party distribution channels. You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the

3



Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

**3.7 Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

**3.8 Financial Books & Records; Audits.**

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any

4

deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.  The inspections will commence during normal business hours although we may observe Facility operation at any time.  You and the Facility staff will cooperate with the inspector performing the inspection.  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection.  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Ramada Worldwide Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11  **Conferences.**  You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2.  Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a RINA conference. The Fee will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks only from suppliers we approve.  You must lease your exterior signage face plates from our approved leasing company.  You may purchase or lease other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You will follow System Standards for

identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 125 points and the most recent quality assurance inspection score for the Facility was no more than 150 points (or equivalent scores under a successor quality assurance scoring system we employ),  when the Facility is otherwise eligible for a Minor Renovation.

4.  **Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1  **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date, **unless the initial general manager is Karen Cornell, who was the general manager for the prior Licensee.**  If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place.  Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general



manager orientation within that time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $1,100 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. If you fail to do so, we may charge you cancellation fees and/or enhanced tuition under Section 4.1.6.

4.1.2 **Owner Orientation Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period. If you fail to do so, we may charge you cancellation fees and/or enhanced tuition under Section 4.1.6.

4.1.3 **On-Site Opening Training.**  We may provide and your staff must attend, if offered, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. We currently do not charge tuition for this program, but may do so in the future. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

4.1.4 **Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. Tuition for remedial on-site training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

RAMEXC1
183636.4  Q3/05




**4.1.5 Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

**4.1.6 Enhanced Tuition and Cancellation Fees.** If you or your general manager do not attend orientation within the required time period, we may charge you tuition of up to 150% of the amount in effect for the program when you or your general manager attends the program, as disclosed in our Uniform Franchise Offering Circular ("UFOC") for new licensees. If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, or if you or the member fails to attend a training program as scheduled without notifying us in advance, we will charge you a cancellation fee of up to 100% of the tuition for the program. The cancellation fee is non-refundable and you will also be charged the full tuition in effect for the program when you reschedule the training.

**4.2 Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

**4.3 Marketing.**

**4.3.1** We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

RAMEXC1
183636.4 Q3/05



4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.9. We have the unlimited right to reinspect if the Facility does not achieve the score

9



required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6. Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000. You will pay us a non-refundable Relicense Fee in the amount of $19,000.00 when you sign this Agreement, which is fully earned when we sign this Agreement.

**7. Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

RAMEXCI
183636.4 Q3/05

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8.  Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.  We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

11



**9. Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your

12



owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or

13



within 30 days after you receive written notice from us of any other default (except as noted below and/or unless the default is such that it cannot reasonably be cured in within 30 days, in which case you shall have such additional time to cure the default as may be reasonably required provided that you commence efforts to cure said default with such 30-day period and thereafter diligently pursue the cure to completion), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

**11.2 Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

**11.3 Casualty and Condemnation.**

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination

14



requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

**11.4   Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

**11.5   Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

**12.   Liquidated Damages.**

**12.1   Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and RINA Services Assessment Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and RINA Services Assessment Fees since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such

*Capped at 2,000,000*

RAMEXC1
183636.4  Q3/05



payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of six months after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the six months notice period if the Condemnation is completed before the six months notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the six months notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13. Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days

after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17.1 – 17.7 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject to or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under

17



U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete in all material respects, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory defined in Section 17.8. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential

18



Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S.  Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

**15.5  Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

**15.6  The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties.  You must participate in the Chain's best available rate on the Internet guarantee or successor program.  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

**16.  Relationship of Parties.**

**16.1  Independence.**  You are an independent contractor.  You are not our legal representative or

agent, and you have no power to obligate us for any purpose whatsoever.  We and you have a business relationship based entirely on and circumscribed by this Agreement.  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

19



16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17. Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Worldwide Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration; Fax No. (973) 496-5359

Your name: Fairview Hospitality, LLC,
Your address: 101 S. Hanley Suite 1700, St. Louis, MO 63105,
Attention: Brad Cytron; Your fax No.: 314-615-6001.

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

RAMEXC1
183636.4 Q3/05



17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6 Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

21

**17.7.3**  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4**  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5**  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

**17.8  Protected Territory.**  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed.  The Protected Territory fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance.  The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.  The Protected Territory means an area within a circle created by a three (3) mile radius whose centerpoint is the front door of the Facility.

**18.  Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1  Your Additional Termination Right.**  You may terminate the License without cause or penalty effective only on the fifth  or tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default **beyond any**



**applicable cure period** under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you **(which time periods are specified in Section 11.1)**, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 125 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 125 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.2  **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.3.  **Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the RINA Services Assessment Fee (excluding commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section:

18.3.1  The Combined Fee shall be six and one half percent (6.5%) of Gross Room Revenues accruing during the first **and second** License Year; and

18.3.2  The Combined Fee shall be **seven** and one half percent (7.5%) of Gross Room Revenues accruing during the **third** License Year; providing the Facility receives a quality assurance inspection score of **50** or less (or its then equivalent) for each quality assurance inspection conducted during the **second** License Year, and

18.3.3  The Royalty and Basic Service Charge shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the **third** License Year.

18.3.4  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default **(which time periods are specified in**

23



**Section 11.1)**, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then equivalent) and the Facility achieves a quality assurance inspection score of less than 125 in a reinspection to be performed not less than 60 days after the initial inspection.

18.4 **Minimum Net Worth.** You will maintain at all times this Agreement is executory a minimum tangible net worth of $1.0 million, computed under United States Generally Accepted Accounting Principles ("US GAAP"). You represent and warrant to us for the purpose of inducing us to enter into this Agreement, that at the time you sign this Agreement, you have a tangible net worth so computed of at least $1.0 million.  You will submit a certificate signed by your Chief Executive Officer and the Chief Financial Officer, within 90 days after the end of each fiscal year, stating your actual tangible net worth, computed under US GAAP.  If any such certificate, or any other financial report and information provided to us by or about you indicates that your tangible net worth has fallen below the minimum amount set forth in this Section, you will take any steps necessary to restore the net worth within 30 days.  If the deficiency is not corrected, at any time before you prove your net worth meets the minimum described above, we may terminate the License or this Agreement if the Facility has not then opened under the System, for cause under Section 11.2.

18.5 **Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be TWO HUNDRED THOUSAND DOLLARS ($200,000).

24



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
RAMADA WORLDWIDE INC.:

By: _____          Attest: _____
            Vice President                                      Assistant Secretary


**YOU,** as licensee:
**FAIRVIEW HOSPITALITY, LLC, a**
**Missouri limited liability company**
        **By its Manager,**
        **CYTRON MANAGEMENT, LLC,**
        **a Missouri limited liability company**

By: _____          Witness: _____
            Manager

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

26

Effective Date means the date that you first take possession of the Facility, even if you sign this Agreement after the date you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

27

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **6900 North Illinois Street, Fairview Heights, IL 62208,** as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii)

trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date as of which we authorize you to open the Facility for business identified by the Marks and using the System even if you sign this Agreement after that date. Unless we require that you close the Facility to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee you are to pay for signing this Agreement as stated in Section 6. It also refers to the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

29

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Worldwide Inc., a Delaware corporation, its successors and assigns.

RAMEXC1
183636.4 Q3/05

## SCHEDULE A

**(Legal Description of Facility)**

RAMEXC1
183636.4  Q3/05

## Legal Description

Part of the Southwest Quarter of Section 22, Township 2 North, Range 8 West of the Third Principal Meridian in St. Clair County, Illinois, being all part of said Southwest Quarter bounded by the Highway right of way lines of Ramp "C" of F.A.I. 64, S.B.I. 159 (F.A. Rte 50), and Frontage Road "D" of F.A.I. 64 and more particularly described as follows:

Commencing at a point which is 140.08 feet right of Station 45+00.55 of centerline of S.B.I. 159 (F.A. 50) as shown on the plat of said road and recorded in the Recorder's Office of St. Clair County, Illinois in Book of Plats "64" on page 120 and 35.00 feet right of Station 99+88.64 of centerline of Frontage Road "D" as shown on said plat, this being the point of beginning, thence North 89 degrees 32 minutes 15 seconds East along the South right of way line of said right of way line of said Frontage Road "D" a distance of 155.00 feet, thence continuing along the last described course a distance of 15.73 feet, thence along the arc of a circular curve to the right having a radius of 325.00 feet, an arc length of 484.70 feet and a chord that bears South 47 degrees 44 minutes 15 seconds East a distance of 441.01 feet, thence South 05 degrees 00 minutes 45 seconds East, a distance of 291.35 feet, thence South 84 degrees 59 minutes 44 seconds West, a distance of 85.87 feet; thence North 39 degrees 31 minutes 32 seconds West, a distance of 109.45 feet, thence South 50 degrees 25 minutes 18 seconds West, a distance of 20.00 feet; thence North 56 degrees 38 minutes 09 seconds West, a distance of 129.34 feet; thence North 64 degrees 46 minutes 23 seconds West, a distance of 244.03 feet; thence North 04 degrees 03 minutes 02 seconds West, a distance of 185.52 feet; thence North 03 degrees 34 minutes 33 seconds West, a distance of 161.38 feet to the point of beginning.

Except the coal underlying the surface of said land and all rights and easements in favor of the estate of said coal.

And further excepting the oil underlying the surface of that part of the premises which was conveyed by Donald G. Soffer and Pearl Soffer, his wife, to Chicago Title and Trust Company, as Trustee under the provisions of a trust agreement dated November 9, 1978 and known as Trust No. 1073597 in a Warranty Deed dated November 8, 1978 and recorded November 9, 1978 in Book 2454 Page 1491.

Situated in the County of St. Clair and the State of Illinois

**SCHEDULE B**

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|---|---|---|
| Cytron Investments, LLC | 10% | Member |
| Gene Robert Frederic Trust 2 | 5% | Member |
| Timothy G. Sansone Ltd. 1/15/97 | 5% | Member |
| Joe Buck, Inc. | 10% | Member |
| Joseph Q. DiMartini 2002 Irrevocable Trust | 5% | Member |
| Where's Joe No. 1, LLC | 20% | Member |
| Eric Joseph Schaefer Revocable Trust | 25% | Member |
| Carl Bauer Gebhard Trust | 10% | Member |
| Gladys M. Minkler Trust U/A | 10% | Member |

PART II:              THE FACILITY:

Primary designation of Facility:  **Ramada** Inn

Number of approved guest rooms: 159

Parking facilities (number of spaces, description): 159

Other amenities, services and facilities: Interior Corridors, TGI Friday's Restaurant, Indoor Pool, Outdoor Pool, Game Room, Exercise Room, Meeting Space, Funny Bone Comedy Club

PART 111:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
             COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

BJC
—————
Initial

RAMEXC1
183636.4 Q3/05



# RAMADA
W O R L D W I D E

**FRANCHISOR:  RAMADA FRANCHISE SYSTEMS, INC.**
**"SCHEDULE B PART III"**
**PUNCHLIST FOR CHANGE OF OWNERSHIP**
**OCTOBER 18, 2005**
*(Revised on February 10, 2006)*

---

| **FACILITY** | **TIER** | **GUESTROOMS** |
|---|---|---|
| Ramada Inn #00345 | Inn | 159 |
| 6900 North Illinois Street | | |
| Fairview Heights, IL 62208 | | |

**OWNER/APPLICANT**
Brad Cytron
(314) 615-6114

**FRANCHISE RETENTION**
Ted Anka
(312) 925-2738

**Q.A. REPRESENTATIVE**
John M. Fair

## PROPERTY CONDITION SUMMARY

This 30-year-old facility consists of one rectangular-shaped, 5-story, interior-corridor building with stucco and painted brick facades. The facility will require exterior, public area and guestroom/bath renovations to comply with System Standards. Landscaping will require upgrading to enhance curb appeal.

The property is located off I-64 approximately 13 miles east of St. Louis, MO and approximately 25 miles east of Lambert St. Louis International Airport. The market is primarily driven by leisure/group business with some corporate/military traffic. Area competition consists of a Best Western, Hampton Inn, Fairfield Inn, Drury Inn and Super 8 Motel.

| | **EXISTING** | **STANDARD** |
|---|---|---|
| Lobby Dimensions: | 825 SF | 800 SF |
| Guestroom Dimensions: | 312 SF (157) | 288 SF |
| | 624 SF (   2) | |

## COMPLETION TIME

All items listed in this punchlist must be completed within the noted time frames

## 2 ATTACHMENTS

1.      Summary of F&B Standards (4 pages)
2.      Complimentary Continental Breakfast Menu Summary (1 page)

BJC

2

Ramada Inn #00345
Fairview Heights, Illinois

> *All Ramada properties are required to be in compliance with all items outlined in the Standards of Operations and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist.*

- All new Ramada Owners and General Managers are required to complete orientation no later than 90 days from new License Agreement.
- Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements no later than 90 days from new License Agreement.
- Ramada Inn exterior signage per System Standards.
- Dumpster enclosure to conceal from guests' view.
- Complimentary USA Today® newspapers (minimum 35) must be provided Monday through Friday.
- Safe deposit boxes: 1 per 20 guestrooms, minimum of 6.
- One sanitary dispensing ice machine per 60 rooms.
- Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances.
- Electronic locks meeting Company standards are required immediately.
- Electronic key cards must include the Ramada logo with the 800 number to central reservations and WWW.Ramada.com.
- A self-closing device on all interior guestroom entrance doors.
- A one-way viewer in all guestroom entrance doors.
- Secondary locks (chain or u-bar) on guestroom entrance doors.
- Hardwired smoke detectors with a backup system.  This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.
- A one-way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors.  Operating knobs must be located on room side only with flush plates on inside of doors.
- A minimum of two framed pictures with glass fronts, (24" x 30" minimum), and/or one large picture with glass front (30" x 30" minimum).
- Night-lights are required in all guestrooms.  Suggested placement for these night-lights include bathroom, vanity or entrance door area.
- A full-length mirror (minimum 14" x 54") in each guestroom.
- Removable wooden hook style hangers, 5 coat and 3 skirt.
- UL approved fire resistant wastebaskets.
- AM/FM clock radio in each guestroom.
- A minimum of 50% of guestrooms must be prepared and designated as non-smoking rooms.

B1C

3

Ramada Inn #00345
Fairview Heights, Illinois

*All Ramada properties are required to be in compliance with all items outlined in the Standards of Operations and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist. (Continued)*

- A UL rated coffee maker with automatic shut off and the required supplies in each room.
- All guestrooms must be equipped with a full size ironing board and a steam iron with automatic shut off feature.
- Minimum 25" remote control televisions are required.
- A GFCI (Ground Fault Circuit Interrupter) outlet in all vanity areas.
- **A wall-mounted hairdryer is recommended in each room.**
- Same day laundry/valet service Monday thru Friday.
- Company requires that all properties maintain housekeeping at the highest levels.
- Provide complimentary wireless, high-speed Internet access in all public spaces and guestrooms from an approved Vendor (i.e. Golden Tree, Netopia and SolutionInc.).

*In addition, the following renovations are required for this site.*

## TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT

## PUBLIC AREAS:

Ensure phone system provides an automated wake-up calls with a greeting message. At the time of the inspection no recorded greeting was provided.

## OPERATIONAL REQUIREMENTS:

1.  Company requires that all properties maintain housekeeping at the highest levels.

2.  Ensure property is in compliance with all items outlined in the Standards of Operation and Design Manual for Ramada to include but not be limited to current market collateral, staff uniforms, guest convenience and amenity items, guestroom amenities and supplies and so on.

BJC

4

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

---

## FOOD AND BEVERAGE FACILITIES:

1.  Ramada Inns are designed to be full service properties. They are required to have a full menu service restaurant with 3 meal periods, a lounge and meeting room facilities or a Hospitality Area with Mart and meeting room facilities. These areas must be fully operational and comply with all specifications as outlined in the Ramada Standards of Operations and Design Manual. At the time of the inspection the TGI Friday's was not open for breakfast, therefore a continental breakfast as per Attachments #1 and #2 will be required.

2.  If at anytime in the future, the restaurant closes the following items will be required:
    a.  The construction of a Ramada Convenience Mart and Hospitality Area is required per current System Standards. Plans are required to be submitted to the Design and Development Department for approval prior to commencement of work.
    b.  Provide complimentary continental breakfast menu items per current System Standards.
    c.  Stock Ramada Convenience Mart with required Sundry items per current System Standards.

3.  **Renovate the existing Breakfast/Hospitality area to include but not limited to the following:**
    a.  Provide appropriate taped background music per specifications in Attachment #1. Radio broadcasts are not acceptable.
    b.  Ensure that ceiling lighting is adjustable with dimmers or multiple switches per specifications in Attachment #1.
    c.  Provide a large screen television (minimum 32") enclosed in built in millwork or armoire unless a wall mounted flat screen (minimum 50") is provided.
    d.  **Existing breakfast seating for 44 is required.**

4.  Provide complimentary continental breakfast menu items as in Attachment #2.

B3Q

5

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

## FOOD AND BEVERAGE FACILITIES:

5.  The existing pantry area does not meet current Ramada specifications. Reconstruction/modification of area to comply with all specifications as in Attachment #1 is required. Plans are required to be submitted to the Design and Development Department for approval prior to commencement of work. Renovate the pantry to include but not limited to the following:  **The following items are exempt if the pantry complies with all local codes.**

    a.  Provide pantry equipment to include an icemaker and a double sink per specifications in Attachment #1. In addition a wall-mounted hand sink must be provided if required by local code.

    b.  A prep counter, storage cabinets and waste receptacle per specifications in Attachment #1 are required.

    c.  If china and silverware are used a glass washer, glass dolly and glass racks must be provided per specifications in Attachment #1.

    d.  Provide a minimum of one 0.7 cu ft. capacity, 700-Watt, UL-rated and NSF certified commercial microwave unit per specifications in Attachment #1.

    e.  Ensure pantry flooring is vinyl tile at a minimum and install non-skid pads in high traffic areas.

    f.  Ensure the pantry walls are finished with high quality enamel or epoxy paint.

    g.  Ensure that pantry door is a minimum of 3'. Incorporate door closers and kickplates.

    h.  Ensure that pantry ceiling is a smooth finish, washable, painted drywall. Vinyl finish lay in tile is also acceptable.

---

**TO BE COMPLETED WITHIN 90 DAYS OF THE NEW LICENSE AGREEMENT**

1.  Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements.

2.  No later than December 31, 2005, provide complimentary wireless, high-speed Internet access in all public spaces and guestrooms. Contracts are required to be executed with an approved Vendor (i.e. Golden Tree, Netopia and SolutionInc.).

PJC

6

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT**

---

## PROPERTY SIGNAGE:

1.    Removal of all existing signage is required.

2.    New signage must be leased and manufactured only by vendors approved in advance by the Franchisor, and may not be installed without prior written approval. **Your License Agreement controls your use of signage and timing of installation.** All existing signage (building, high-rise, channel letters, billboards, etc.) must be removed. Modification of the existing signage or face replacement is prohibited.

3.    Paint stanchions and stanchion guard poles. Contact the Brand Identity Department at (973) 496-5224 for approved stanchion colors.


## PROPERTY EXTERIOR:

1.    Upgrade building exteriors to include:
    a.    Paint building exteriors (doors, fascia, soffits, stucco and brick facades, fire extinguisher cabinets and PTAC casings). Contact the Design and Development Department for recommended color schemes at (973) 496-2522.
    b.    Replace awnings at 1st floor windows and secondary entrances. Contact the Brand Identity Department at (973) 496-5224 for assistance.
    c.    Replace windows to eliminate broken seals and fogged appearance.
    d.    Repour/refinish walkways where damaged or pitted. Pressure wash walkways to eliminate stains.

2.    Renovate parking lot to include the following:
    a.    Reseal and stripe parking lot.
    b.    Paint parking lot lighting poles.
    c.    Repair/replace perimeter chain link fence where damaged or rusted.

3.    Rework existing landscaping focusing on property entrance, porte cochere and perimeter areas.

BJC

7

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

---

## PUBLIC AREAS:

1.  Renovate the lobby and pre-function areas to include the following:
    a.  Replace carpet to include hallways and meeting room pre-function area. Company requires minimum 32-ounce cut pile carpet with padding. Carpet must be designed for commercial traffic.
    b.  Refinish the front desk to eliminate scuffing and finish loss.
    c.  Refinish glass front door frames, including hardware, at entrances to a like new condition.
    d.  The brick accent walls in the lobby and pre-function areas are acceptable as long as condition is maintained.

2.  Renovate the corridors/elevators/stairwells to include the following:
    a.  Professionally clean corridor carpets. If carpet grades a "Moderate" on any future Quality Assurance evaluation, carpet must be replaced. Company requires minimum 32-ounce cut pile carpet with padding. Carpet must be designed for commercial traffic.
    b.  Refinish/paint doors to include service doors and trim.
    c.  Replace corridor wallcovering where scuffed as in the 3rd and 4th floor corridors. Company requires minimum 30-ounce vinyl wallcovering.
    d.  Paint exterior elevator doors and trim.
    e.  Replace elevator flooring. Company requires flooring designed for commercial traffic.
    f.  Repair sagging exterior floor at entrance of the north elevator unit.
    g.  Refinish elevator interior walls. Recommend mirrors, marble or similar finish.
    h.  Replace "drop" style light fixtures at exterior elevator entrances. Ensure new lighting coordinates with existing corridor lighting.
    i.  Enclose/box-in or replace 5th floor landing railings with a vertical picket style. Horizontal railings are not acceptable.
    j.  Paint stairwell railings.

3.  Renovate the guest laundry/vending areas to include the following:
    a.  Provide ice machines to comply with System Standards. Company requires one sanitary, self-dispensing ice machine per every 60 rooms.
    b.  Refinish/replace ice machine panels where rusted.
    c.  Replace vending and guest laundry flooring. Company requires ceramic or quarry tile.

BJC

8

Ramada Inn #00345
Fairview Heights, Illinois

> ## TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED

## PUBLIC AREAS CONTINUED:

     d.   Replace existing vending area wallcovering where scuffed as on the 2nd floor. Company requires either vinyl wallcovering or an approved textured finish.

     e.   Refinish/paint clothes folding counter in the guest laundry.

4.   Renovate the public restrooms to include the flowing:

     a.   Deep clean, re-grout and seal flooring to include base trim in the lobby and 2nd floor restrooms. If condition cannot be restored, replacement is required. Company requires minimum 6" – 8" ceramic tile.

     b.   Replace vinyl wallcovering where damaged in the 2nd floor restroom. Company requires vinyl wallcovering.

     c.   Refinish/paint restroom doors to include trim work.

     d.   Replace vanities in the 2nd floor restroom. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system.

     e.   Replace sink fixtures in the lobby restrooms.

     f.   Replace chipped full-length in the lobby women's restroom. Replace mirrors where de-silvered as in the indoor pool area men's restroom.

     g.   The painted block wall in the indoor pool area restrooms is acceptable if cleaned/painted to eliminate stains.

5.   Renovate the exercise room to include the following;

     a.   Professionally clean carpet. If carpet grades a "Moderate" on any future Quality Assurance evaluation, carpet must be replaced.

     b.   Replace damaged seat on exercise bike.

     c.   Exercise room facility is required to be in compliance with the following specifications:

         1.   The minimum is one treadmill and one multi-station weight machine.

         2.   Additional two units should be 'state of the art' aerobic equipment approved by Ramada.

         3.   Wall mounted TV – Wall/Ceiling (Minimum 25" required)

         4.   Weight Scale

         5.   Three coat/towel hooks

         6.   Telephone with direct dial to front desk

         7.   Full view wall mirror

         8.   Fresh towels and soiled linen disposal

         9.   Water cooler

BJC

9

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

---

## PUBLIC AREAS CONTINUED:

10. All equipment must be maintained and inspected as per the manufacturer guidelines.
11. Emergency instructions, assumed liability signage and guest use only signage must be prominently displayed.
12. The fitness room must have an electronic card reader which is operable by any guestroom key card.

6. Renovate the indoor pool to include the following:
   a. Pressure wash pool deck to eliminate discoloration. If deck cannot be restored to a like-new condition refinishing will be required.
   b. Clean coping tile to eliminate fading.
   c. Refinish/paint doors, restroom doors and service doors to include trim work.
   d. Refinish/replace rusted panels on water fountain.

7. The existing painted block walls in the game room are acceptable if maintained in good condition.

## PROPERTY MANAGEMENT SYSTEM:

Existing property management system will require a standard hardware refresh.

## FOOD AND BEVERAGE:

1. Upgrade lounge to include:
   a. Replace carpet. Company requires minimum 32-ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. **Carpet is acceptable if in compliance with Funny Bones standards.**
   b. Paint railings and doors to eliminate scuffed and chipped finishes.

BJC

10

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

---

2.  Upgrade meeting rooms to include the following:
    a.  Repair damaged/discolored soundproof room dividers. If the soundproof dividers cannot be restored to a like-new condition replacement will be required. Replace non-compliant accordion dividers as per System Standards. Room dividers must be soundproof to 50STC decibel requirements.  Accordion type folding partitions are not acceptable.
    b.  Refinish/paint entrance and service doors to include trim work.

---

**GUESTROOMS/BATHS** (Rooms Inspected; 126, 130, 212, 217, 220, 303, 305, 309, 324, 420, 425, 439, 507, 515, 520):

1.  Renovate guestrooms to include the following:
    a.  All furniture, finishes and fixtures must coordinate with other room furnishings.
    b.  Repair carpet where seaming at wall as in room #305.
    c.  Paint/stain entrance, connecting and bath doors to include trim work.
    d.  Repair scuffed, patched and cracked areas of textured walls as in rooms #212, #309 and #420 and repaint entire wall.
    e.  Install drywall to conceal painted block walls as in rooms #420 and #425 and apply an approved wall finish. Painted block walls are not acceptable. Company requires either vinyl wallcovering (minimum of 14 ounce) or an approved textured finish.
    f.  Refinish casegoods (i.e. tables, nightstands, desks, credenzas, armoires, etc.) to eliminate scuffed and surfaces with loss of finish as in rooms #212 and #324. If casegoods cannot be restored to a like-new condition replacement will be required.
    g.  Replace sofa/sleepers, desk chairs, arm chairs and occasional chairs where worn, faded, torn, discolored or stained as in rooms #303 and #324. Provide second matching chair where missing as in room #305. Two comfortable fabric upholstered chairs per room are required.
    h.  Refinish desk and occasional chair frames to eliminate scuffing/scratching as in room #309. If chairs cannot be restored to a like new condition replacement will be required.
    i.  Provide matching floor lamps. Floor lamps must coordinate with existing lamp package and room furnishings. Provide two lamps per headboard wall, a credenza lamp and a floor lamp at leisure area.  All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable.  Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not recommended.

BJC

11

Ramada Inn #00345
Fairview Heights, Illinois

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

---

## GUESTROOMS/BATHS CONTINUED

  j. Replace tarnished entry light fixture as in room #439.
  k. Drop ceilings in 1st floor rooms are acceptable as long as condition is maintained. Access to other rooms is restricted by firewalls.
  l. The existing brass headboards in 2-room suite are acceptable if maintained in good condition.
  m. Replace draperies where stained or damaged as in rooms #217 and #515. Provide blackout drapes where missing as in room #212. New draperies must have blackout capabilities, be pleated to double fullness, provide for overlapping of panels and must be baton or mechanically operated.

2. Renovate bath areas to include the following:
  a. Repair damaged areas of wall vinyl and ceilings as in rooms #304 and #425. Repaint/refinish textured walls and ceilings to a like new condition.
  b. Replace non-compliant laminate vanities as in rooms #217 and #507. Replace vanities where damaged, chipped or burned as in rooms #126 and #439. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system.
  c. Replace plumbing fixtures/trim (sinks and tubs) where tarnished or corroded as in rooms # 217 and #420 (faucets, drains rings, etc.).
  d. Provide tub stoppers where missing as in room #515.
  e. Replace vanity lighting fixtures where rusted as in room #305. A new decorative fixture is required (incandescent or fluorescent lighting is acceptable). Fixture must be wall mounted over the vanity area.
  f. Replace bathtubs where chipped/damaged as in rooms #324 and #507. The installation of commercial grade liners or professionally restoring surfaces to like new condition is an acceptable option.
  g. Clean/replace tub/shower surrounds where tiles are mildewed, damaged or mismatched as in room #305. New tiles must match existing tiles. If matching tiles cannot be found complete replacement of tile surround will be required. New surrounds must be of ceramic tile, synthetic marble or acrylic of a light, neutral color.
  h. Replace non-skid treatments in all tubs where discolored as in rooms #217 and #420.
  i. Complete installation of Moen Revolution showerheads, curved shower rods and Ramada specialty hookless shower curtains in all bath areas.

PJC

12

Ramada Inn #00345
Fairview Heights, Illinois

---

***TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE
AGREEMENT CONTINUED***

---

## *GUESTROOMS/BATHS CONTINUED*

     j.     Existing vanity mirrors are acceptable until condition grades a "Moderate" on any future Quality Assurance evaluation. Upon replacement vanity mirrors should extend the length of the vanity.

     k.     Replace existing Ramada bath supplies with the new "Relax Retreat" amenities no later than December 31, 2005.

BJC

13

Ramada Inn #00345
Fairview Heights, Illinois

---

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

---

This Punchlist identifies items that require action due to meet the Franchisor's standards. The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations. You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified. The owner is responsible for meeting all Franchisor Standards. All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist. Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

Note: Any item on this Punchlist that is not required prior to the new license agreement will
continue to be evaluated for appearance and condition during any and all Quality
Assurance evaluations conducted in the interim period.

**This Punchlist was revised on February 10, 2006. All previous copies are inva.id.**
1. revised on 02/10/06 by: ams

00345 CO RI
JD/dg

MARCH 10, 2006

Fairview Hospitality, LLC
By: Cytron Management, LLC
Its: Manager

By: _____

Bradford J. Cytron, Member and Manager

Attachment #1

**Summary of F&B Standards for the New Ramada**
(See Separate Standards for Ramada Plaza Hotels)

1.  Minimum Food and Beverage Standards

    All Ramada Inn properties are required to offer:

    A.  Breakfast from 6:30 a.m. – 10:00 a.m.

        ▪ Full American breakfast (buffet or ala carte) in a full-service restaurant,

                                Or

        ▪ Continental Breakfast Buffet in a restaurant or Hospitality Area.  If the
          Continental Breakfast Buffet option is chosen, it must be complimentary to guests.

    B.  Lunch, dinner and snack service either:

        ▪ By providing restaurant service for lunch for any 2-hour period between 11:30
          a.m. – 2:00 p.m. and for dinner for any 3-hour period between the hours of 5:00
          p.m. – 10:00 p.m.,

                                Or

        ▪ By providing a Ramada Convenience Mart, available to guests on a 24-hour basis.

    C.  Alcoholic beverages (code permitting) either by having a bar/cocktail lounge or an assortment
        of wines and beers in the Ramada Mart.

2.  Hospitality Area

    ● The Hospitality Area is a signature feature of a breakfast-only Ramada.  The Hospitality
      Area shall accommodate at minimum 20 seats or seating equivalent to 1/3 of the
      guestrooms, whichever is greater, as well as the buffet and pantry/storage areas.  Must be
      conveniently accessible from the lobby.  Seating must be designed to provide for a
      minimum space of 15 square feet per seat, plus buffet and pantry/storage areas.  For a
      100-room property, approximately 1,000 square feet would be required, depending on
      space configuration.

    ● The Hospitality Area shall be designed as a multi-function area, with its primary
      function being to accommodate the Breakfast Buffet. ·The seating areas must also be
      designed to function as lounge-conversation areas to accommodate the service of
      afternoon coffee and snacks or an evening cocktail hour.  Hospitality area layout and
      furniture plan must be submitted in advance to Ramada Franchise Systems for approval.

    ● A uniformed attendant must staff the Hospitality Area during serving hours.

    ● Appropriate taped background music must be provided (radio is not permitted).

    ● The Hospitality Area must be designated as non-smoking.

BJC

Hospitality Area (cont'd)                                                                                  Page 2

- This space shall have an open, airy feel. This area shall be attractively decorated so that it coordinates with the rest of the property and enhances the image that the property is presenting to its customer.

- The design of the ceiling shall compliment and be compatible with the lobby.

- Ceiling lighting must be adjustable with dimmers or multiple switches and layout must coordinate with interior design plan. Lighting directly over breakfast area should be on separate switches.

- A large screen television (32" minimum) is required in the Hospitality Area. The TV must be enclosed in built-in millwork or armoire unless wall mounted flat screen (50" minimum).

- Wall Treatment - Must be vinyl or textured finish. Vinyl must be a minimum of 20 oz. (54" wide) and installed so that there will be a minimum of seams showing. The wall vinyl should meet flame spread of 0-25 and smoke development of 0-450.

- Floor Treatment –Must be ceramic tile or stone (12" x 12" min.) or carpet. All carpeting shall be cut pile construction with a minimum face weight of 32 oz., 1/10 gauge or greater. Other styles of carpet must be submitted to corporate headquarters for approval. Branded continuous filament solution dyed nylon product is recommended. Olefin is not recommended. Carpet must pass Vetterman Drum test graded to meet commercial medium to heavy traffic.

- Carpet Padding - All carpet padding must be synthetic hair/jute, be a minimum of 3/8" thickness, 40 oz per square yard weight, 7.0 cu. ft density, pass the flammability pill test DOC-FF1-70 and smoke density test (NBS).

- Window Treatment – All windows are to be appropriately covered with drapes and sheers with cornices. Fabric pattern/color should coordinate with the room design; drape fabric must be fire retardant. Blinds or shutters may be acceptable depending on design and require design approval.

- Seating Areas – Chairs at tables must be a construction that is suitable for heavy-duty commercial use. Upholstery must coordinate with the overall design of the room, have a minimum of 30,000 double rub counts or greater, and have a stain resistant finish. All upholstery fabric shall conform to Class I criteria. Local, State or Federal codes may require more stringent flame retardant testing. Banquet / stackable chairs are not permitted.

- Tables – Guest tables for Continental Breakfast must be 36" x 36", or 24" x 30", have a pressure laminate top with self-edging whose color coordinates with the design of the room.

- Artwork – All artwork must coordinate with the rooms design, have a suitable frame with a single matt, be a minimum of 24" x 30"w size, installed with theft proof wall mounts and be of a quantity suitable to each individual room size. Recommend regional scenes for the artwork.

BJC

Hospitality Area (cont'd.)                                                Page 3

- Accessories – The areas must be attractively accessorized, and all accessories; plants, centerpieces, accent pieces must coordinate with the overall room design.

- Counter space must be a minimum of 20 linear feet and 24" deep. Counters must be built-in. Countertops must be tile, stone, pressure laminate or sealed wood. Banquet tables are not permitted.

- At minimum one 0.7 cu. Ft. capacity-700-Watt, UL rated and NSF certified, commercial microwave unit is required to be displayed on the required counter space.

- Electrical Outlets – Sufficient outlets must be provided above the countertop to service the microwave oven, toasters, chafing dishes (if electric), coffee warmers and other equipment.

3.  Pantry or Kitchen Area

- A Pantry Area or Kitchen is required, which is adjacent to the Hospitality Area (kitchen minimum is 250 square feet). If a full American Breakfast is offered, the kitchen must contain primary cooking equipment, Ware Washing Equipment, Prep Counter, Storage, etc.

- If a continental breakfast is served, primary cooking equipment is not required, and the pantry area must be large enough to accommodate all required equipment listed below (see Attachment #5 for reference). Must meet all local codes.

- Pantry equipment must include: Commercial grade refrigerator, freezer, icemaker and microwave. A double sink must be provided, in addition, a wall mounted hand sink will be provided if required by local code. A prep counter, storage cabinets and waste receptacle must be provided. If china and silverware are used, a glass washer, glass dolly and glass racks must be provided.

- At minimum one 0.7 cu. Ft. capacity-700-Watt, UL rated and NSF certified, commercial microwave unit is required in the pantry or kitchen area if a continental breakfast is served.

- Cooling, heating, exhaust and tempered air shall be designed as per the equipment and usage.

- Pantry or kitchen floor must have vinyl tile minimum. Non-skid pads should be installed in high traffic areas. Use moisture resistant gypsum board at all wet walls.

- Pantry walls must be a minimum painted finish with high quality enamel or epoxy paint.

- Pantry door shall be a minimum width of 3'. Door closers and kick plates shall be incorporated.

- The Pantry ceiling shall be a smooth finish, painted drywall for maintenance purposes and must be washable. Vinyl finish lay in tile is also acceptable.

BJC

Pantry or Kitchen Area (cont'd.)                                    Page 4

- Pantry lighting shall be fluorescent, general illumination.  Outlets shall be appropriately spaced for current and future use.  Plug (GFI) mold is suggested for work counter.

4.  Ramada Convenience Mart

- Minimum of 80 Square Feet.  Recommend that the Mart adjoin the Front Desk or Hospitality Area.

- Cooler/Freezer/Refrigerators/Shelves to be Set In, Trimmed with Molding, Well Lit.

- High Quality Shelving, Racks, Display Cases, Lighting

- Sensor installed at the entrance to chime when a customer enters the Mart.

- Ramada Convenience Mart minimum Sundry items requirements per Ramada standard.  Inventory to be displayed in approved baskets, trays and racks.

Attachment #2

|  | **Mandatory** | **Optional** |
|---|---|---|
| Coffee/Tea: | Freshly Brewed Regular & Decaf Coffee & Assorted Teas | Additional Flavored Coffee (*Folgers®* Regular & Decaf Recommended) (*Lipton®*Tea Recommended) |
| Juice: | Orange/Apple/Cranberry | Additional Juices *(Minute Maid® Recommended)* |
| Milk: | Whole and Skim (or 1%) Half & Half Creamers or Shelf-Stable Creamers Non-Dairy Coffee Creamers 3 Flavored Individual Creamers | Chocolate Milk |
| RTE Cereal: | Minimum 6 Cold, 1 Hot a) Two Kids b) Two Mainstream c) One Senior d) One Health | Additional Varieties (Kellogg's® Frosted Flakes®, Fruit Loops®) (Kellogg's ® Special K®, Rice Krispies®) (Kellogg's® Raisin Bran®) (*Quaker®* Instant Oatmeal Recommended) (Kellogg's® Low Fat Granola) |
|  | Instant Hot Oatmeal | Instant Cream of Wheat |
| Fruit: | Bananas/Apples/Oranges | Seasonal Fruit, Grapefruit, Strawberries, Grapes, Pears, Tangerines, etc. |
| Baked Goods: | <u>Three Non-Sweet: (Examples)</u> a) White and Wheat Bread (Toast) b) Bagels c) English Muffins | Croissants |
|  | <u>Three Sweet:  (Examples)</u> a) Muffins b) Danish c) Donuts | Breakfast Bars (Kellogg's® Recommended) Pop Tarts (Kellogg's® Recommended) Honey Buns, Coffee Cake, Cinnamon Rolls |
| Toppings: | Margarine, Butter, Cream Cheese, Jelly & Peanut Butter, Sugar and Sugar Substitute | |
| Yogurt: | Minimum of 3 flavors (Dannon® or Yoplait® are Recommended) | |
| Hot Item: | Choice of One Rotating Hot Breakfast Entree such as: Waffles, Breakfast Sandwiches, Pancakes or Eggs & Bacon | |

Health Conscious Item:    An Atkins Friendly/Low-Carb Item  (i.e. Eggs & Bacon)

**Note:  Buffet Arrangement, Display Materials, Service Equipment Per Ramada Specifications**

6 in. China plates, 6 oz. juice glasses, 8 oz. China or glass coffee mugs or 6 oz. China cups with saucers and stainless flatware are highly recommended.

<u>Minimum Standards</u>

- Disposable plates made of laminated foam, plastic or heavy paper.
- 8 oz. Styrofoam coffee cups and 6 oz. heavy plastic juice cups
- Plastic utensils must be medium heavy to heavy weight

BJC

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**
**September 2005**

A.   RINA Services Assessment Fee

The RINA Services Assessment Fee is equal to 4.5% of Gross Room Revenues.  The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

B.   RMA Fee

To provide additional regional marketing services through your RMA, we have established a mandatory "RMA Fee".  The RMA Fee is $1.25 per guest room per month, up to a maximum of $250 per month.  In 2005, the RMA Fee will be paid in two equal installments after we invoice you.  The first installment will be payable on or before January 15, 2005 and the second installment will be payable on or before March 31, 2005.  After 2005, the RMA Fee will be payable in one installment in advance at a date we will determine and communicate to you at least 60 days in advance.  The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval.  Each RMA may elect to charge supplemental RMA Fees with our approval.

C.   GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility.  The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS.  Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website.  GDS and Internet-originated reservations may also carry a commission if the originator qualifies.  If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.   Additional RINA Services Assessment Fees or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of $.35 per commissionable reservation.  Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs.  The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

RAMEXC1
183636.4 Q3/05

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf.

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.    Special Marketing Assessment

We charge a Special Marketing Assessment for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise,

35



entertainment and other awards. The Special Marketing Assessment is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

F.      Guest Services Assessment

        We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to and resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the RINA Executive Committee. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

RAMEXC1
183636.4 Q3/05



**CENDANT HOTEL GROUP, INC.**
**RAMADA WORLDWIDE INC.**

**FRANCHISE CLOSING ACKNOWLEDGMENT EXHIBIT**

As you know, you (or the entity you represent) and we are entering into a Franchise Agreement for the operation of a Ramada franchise. The purpose of this Closing Acknowledgment is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading. Please review each of the following questions carefully and provide honest, accurate and complete responses to each question.

**Acknowledgments and Representations\*.**

1.  Did you receive a copy of our Uniform Franchise Offering Circular ("UFOC") (and all exhibits and attachments) at least 10 business days before you signed the Franchise Agreement? Check one: (X)Yes (_) No. If no, please tell us if and when you received the UFOC and when you signed the Franchise Agreement. Please explain why you signed the Franchise Agreement before the 10 business days expired:

    _____

1A. For **Illinois residents** or those wishing to locate their franchise in Illinois, did you receive a copy of our UFOC (and all exhibits and attachments) at least 14 calendar days prior to signing the Franchise Agreement? Check one: (X)Yes (_) No.  If no, please comment:

    _____

2.  Did you understand all the information in the UFOC and your rights and obligations under the Franchise Agreement? Check one: (X)Yes (_) No.  If no, please comment:

    _____

3.  Did you receive a copy of the Franchise Agreement at least 5 business days before you signed the Franchise Agreement? Check one: (X)Yes (_) No.  If no, tell us when you received the Franchise Agreement and when you signed it. Please explain why you signed the Franchise Agreement when you did:

    _____

4.  Have you studied and reviewed carefully our UFOC and the Franchise Agreement you received? Check one: (X)Yes (_) No.  If no, please comment:

    _____

5.  Was any oral, written or visual claim, statement, presentation or representation made to you which contradicted the disclosures in the UFOC? Check one: (_)Yes (X) No.  If yes, please explain in detail the oral, written or visual statement, presentation, claim or representation:

    _____

6.  Except for the earnings claim included as Exhibit 19 in our UFOC, did any Employee or other person speaking on our behalf make any oral, written or visual claim, statement, promise or representation to you that stated, suggested, predicted or projected sales, revenues, expenses, earnings, income or profit levels at any _____ location or business, or the likelihood of success at your franchised business? Check one: (_)Yes (X) No.  If yes, please explain in detail who made and what you understand is the oral, written or visual claim, statement, promise or representation:

    _____

1

7.    Except for the earnings claim included as Exhibit 19 in our UFOC did any employee or other person speaking on our behalf make any statement or promise regarding the costs involved in operating a franchise that is not contained in the UFOC or that is contrary to, or different from, the information contained in the UFOC.  Check one: (_)Yes (X) No.  If yes, please identify who made the statement or promise and what you understand are the details of the statement or promise.

_____

_____

8.    Do you understand that the franchise granted is for the right to operate a Ramada Inn lodging facility at the authorized location only and includes any area of protection, described in the Franchise Agreement, and that we and our affiliates have the right to issue franchises for or at locations, as we determine anywhere outside the protected territory described in the Franchise Agreement? Check one: (X)Yes (_) No.  If no, please comment:

_____

_____

9.    Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise for the franchised business, meaning that any prior oral or written statements not set out in the Franchise Agreement will not be binding? Check one: (X)Yes (_) No.  If no, please comment:

_____

_____

10.   Do you understand that the success or failure of your franchise will depend in large part upon your skills and experience, your business acumen, the hours you work, the location you select, your management of your room rates and inventory, the local market for lodging, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition, financing terms and other economic and business factors? Further, do you understand that the economic and business factors that exist at the time you open your franchise may change? Check one: (X)Yes (_) No.  If no, please comment:

_____

_____

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.   BY SIGNING THIS ACKNOWLEDGMENT, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS. IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH. PLEASE DATE AND INITIAL EACH SEPARATE SHEET.

**NOTE:** **IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, EACH OF ITS GUARANTORS MUST EXECUTE THIS ACKNOWLEDGMENT.**

**FAIRVIEW HOSPITALITY, LLC,**
**a Missouri limited liability company**

By:    CYTRON MANAGEMENT, LLC, a Missouri limited
       liability company

Its:    Manager

By:    _____
       Bradford J. Cytron, Sole Member

*Such representations are not intended to nor shall they act as a release, estopped or waiver of any liability incurred under the Illinois Franchise Disclosure Act or under the Maryland Franchise Registration and Disclosure Law.

2

COMEXC8
165250 Q1/05



## ADDENDUM TO THE LICENSE AGREEMENT PURSUANT TO THE
## ILLINOIS FRANCHISE DISCLOSURE ACT

This Addendum to the License Agreement by and between RAMADA WORLDWIDE INC. ("we", "our" or "us") and <u>FAIRVIEW HOSPITALITY, LLC</u> ("you") dated MARCH 10 , 200 6 .

These provisions supersede anything to the contrary in the License Agreement:

1. The Illinois Franchise Disclosure Act of 1987, as amended (the "Act"), applies to this Agreement and supersedes any conflicting provision of the License Agreement.

2. Section 17.6.3 of the License Agreement is amended by providing that all litigation by or between you and us, arising directly or indirectly from the franchise relationship, shall be commenced and maintained, at our election, in the state courts of Illinois or the United States District Court for Illinois with the specific venue, in either court system, determined by appropriate jurisdiction and venue requirements.

3. The acknowledgments in Section 14 and Section 14.2 are not waivers under the Act. The first and third sentences of Section 14.2 are deleted.

4. If any of the provisions of the License Agreement are inconsistent with applicable state law, then the state law shall apply to the extent such law is constitutional and valid as applied.

5. The acknowledgment of receipt of a copy of the UFOC at least 10 business days before paying any fee or signing any contract with us is deleted from Section 17.7.1 of the License Agreement. Section 17.7.4 of the License Agreement is deleted.

6. Section 17.7.1 is amended to read as follows:

"17.7.1 You received our UFOC for prospective licensees at least 14 days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 14 days before you paid any fee to us or signed any contract with us."

7. Sections 17.7.2 and 17.7.3 are amended to read as follows:

"17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or included in the UFOC. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or included in the UFOC.

17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License except those contained in the UFOC."

1



8.  All other rights, obligations, and provisions of the License Agreement shall remain in full force and effect.  Only the Sections specifically added to or amended by this Addendum shall be affected.  This Addendum is incorporated in and made a part of the License Agreement for the State of Illinois.

IN  WITNESS  WHEREOF,  the  undersigned  have  executed  this  Addendum  as  of  the  date set forth above.

WE:
RAMADA WORLDWIDE INC.

By:_____               Attest:_____
            Vice President                                         Assistant Secretary


YOU, as licensee:
**FAIRVIEW HOSPITALITY, LLC, a**
**Missouri limited liability company**
        **By its Manager,**
        **CYTRON MANAGEMENT, LLC,**
        **a Missouri limited liability company**

By:_____               Witness:_____
            Manager



**To:**      Owners, General Managers and Principal Contacts

**From**:   Keith Pierce, President, Brand Operations, The Americas

Date:    March 25, 2010

**Re:**      **Schedule C Fee Changes**

Please note that Schedule C to your Franchise or License Agreement has changed, a copy of which is attached. The major changes are the following:

1. Customer Care Fees (memo attached)
2. Service Charges for travel agent, general sales agent, property to property and similar reservations at your property (previously communicated to you mid-March).

We recommend that you keep the revised Schedule C with your Franchise or License Agreement or other important property records. Please contact the operations support desk or your director of operations and support with any questions.

Thank you.

1

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**
**March 2010**

### I.      RINA Services Assessment Fee

The RINA Services Assessment Fee consists of the "Marketing Contribution" and the "Basic Reservation Fee." The Marketing Contribution is 2.5% of Gross Room Revenues; the Basic Reservation Fee is 2% of Gross Room Revenues. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

### II.     RMA Fee

To provide additional regional marketing services through your Ramada Management Association or RMA, we have established a mandatory "RMA Fee". The RMA Fee is $15 per guest room per year, up to a maximum of $3,000 per year. The RMA Fee will be payable before the start of each year on a date we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins. The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval. Each RMA may elect to charge supplemental RMA Fees with our approval.

### III.    Additional Fees

### A.     Loyalty Program Charge

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "qualifying stay" at the Facility as defined in the Front Desk Guide or any other program rules. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their Wyndham Rewards membership card upon check-in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

### B.     Customer Care Fee

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to and resolve any complaint to the guest's satisfaction within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $160.00, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. In addition, we may respond to customer complaints posted on third-party travel websites, blogs and similar forums, at our discretion, if you do not promptly address them to the satisfaction of the guest. All guest complaints remain subject to indemnification under this Agreement.

C.      **Best Available Rate Program**

You must (i) make available through the Central Reservation System and any current or future consumer websites that we or our affiliates develop (the "Chain Websites") room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through any of the Chain Websites or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D.      **Service Interruption Fee**

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us the Service Interruption Fee set forth in the System Standards before we restore service.

E.      **GDS and Internet Booking Fees**

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee, as applicable, for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. GDS Fees are assessed for reservations processed through any GDS or through any Internet website or other booking source powered by a GDS. Internet Booking Fees are assessed for any other Internet-originated reservations. We do not currently charge any fees for reservations booked through our Chain website or through our direct connection to on-line travel agents but may do so in the future. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee. GDS and Internet-originated reservations may also incur travel agent and similar commissions. We will establish the amount of the GDS and Internet Booking Fees from time to time based on a weighted average of the fees these distribution channels charge us plus a reasonable overhead charge to cover costs with providing these services.

F.      **Travel Agent Commissions and Other Distribution Charges**

Travel agent and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .75% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company may charge additional commissions and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the travel agent commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.



We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services and programs at any time upon not less than 30 days written notice.

# Exhibit  B

A02264939

MICHAEL T. COSTELLO
RECORDER OF DEEDS
ST. CLAIR COUNTY
BELLEVILLE, IL
05/16/2011   12:00:55PM
RHSP FEE:      10.00
TOTAL FEE:    $30.00
PAGES:    4

This document prepared by:
Lisa S. Leary
FVH Acquisition, LLC
721 Emerson Road, Ste. 200
St. Louis, MO 63141

## DEED IN LIEU OF FORECLOSURE

*THIS DEED IN LIEU OF FORECLOSURE* is made as of this 9th day of Mauy, 2011, by and between **Fairview Hospitality, LLC**, a Missouri limited liability company ("Grantor"), whose address is 50 Portland Drive, St. Louis, Missouri 63131 and **FVH Acquisition, LLC**, a Missouri limited liability company ("Grantee"), whose address is 721 Emerson Road, Suite 200, St. Louis, Missouri 63141.

W I T N E S S E T H:

*WHEREAS*, Grantor is the owner of certain real estate commonly known as 6900 N. Illinois Street, Fairview Heights, Illinois 62208, legally described on **Exhibit A** attached hereto and incorporated herein by reference (the "Real Estate"); and

*WHEREAS*, Grantee is the lender under that certain Mortgage, Security Agreement and Fixture Filing (Illinois), dated March 10, 2006, recorded on March 16, 2006 at Document A01967010 at Book 4308, Page 1395 of the Official Records of St. Clair County, Illinois, as assigned in that certain Assignment of Loan dated January 21, 2010 and recorded February 17, 2010 as Document A02201571 in the Official Records of St. Clair County, Illinois; and that certain Assignment of Mortgage, Assignment of Leases and Rents and other loan documents dated February 25, 2011 and recorded on March 15, 2011 as Document A02257995 in the Official Records of St. Clair County, Illinois (collectively, the "Mortgage"), which is secured by the Real Estate as well as the buildings, structures, fixtures and improvements located on the Real Estate (the "Improvements") and certain personal property; and

*WHEREAS, WHEREAS,* this Deed is hereby delivered by Grantor to Grantee in lieu of foreclosure of the Mortgage.

APPROVED ZONING & PLATTING
_____
Director
SUBDIVISION REGULATIONS

H:\Legal\Deed(4)\Fairview Heights\LSL\05.09.11

*NOW, THEREFORE*, Grantor, pursuant to 735 I.L.C.S. § 5/15-1401, and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration in hand paid, hereby *CONVEYS and WARRANTS* unto Grantee all of its right, title and interest in the Real Estate, together with the Improvements and all easements and appurtenances thereto appertaining to the Real Estate.

Subject to the following:  all general property taxes, building and zoning laws, ordinances and regulations and all easements, covenants, restriction, rights of way apparent or of record.

Grantor acknowledges and agrees that the acceptance of this Deed in Lieu of Foreclosure by the Grantee shall not relieve Grantor from its liability for or from the performance of any and all obligations documented in that certain written Agreement Regarding Conveyance of Property entered into between Grantor and Grantee executed contemporaneously with and of like date hereto.

Grantor warrants to the Grantee and its successors in title that Grantor has not created or permitted to be created any lien, matter, covenant, restriction, exception, charge or encumbrance against said Real Estate, the Improvements, or the easements and appurtenances appertaining thereto and conveyed except as otherwise shown of record; and Grantor covenants that it and its successors and assigns shall and will WARRANT AND FOREVER DEFEND said interest and the conveyance of the same unto Grantee and its successors and assigns forever, against the lawful claims of all persons claiming by, through or under the Grantor but none other.

*IN WITNESS WHEREOF,* the parties have caused this Deed in Lieu of Foreclosure to be executed as of the day and year first above written.

| |
|---|
| AFFIX TRANSFER TAX STAMP |
| OR |
| "Exempt under provisions of Paragraph l, |
| Section 31-45 of the Real Estate Transfer Tax Law |
| (35 ILCS 200/31-45)" |

FVH Acquisition, LLC
By: Drury Development Corporation, its sole member and manager

By: *Larry W. Hasselfeld*
   Larry W. Hasselfeld, Senior Vice President

Date: *5/9/11*

GRANTOR:
Fairview Hospitality, LLC

By: Cytron Management, LLC
   Its Manager

By: _____
   Bradford J. Cytron,
   Its Sole Member

GRANTEE:
FVH Acquisition, LLC

By: Drury Development Corporation
   Its Sole Member and Manager

By: *Larry W. Hasselfeld*
   Larry W. Hasselfeld
   Senior Vice President

2

STATE OF MISSOURI    )
                         ) SS

COUNTY OF ST. LOUIS   )

On this ___9TH___ day of ___MAY___, 2011, before me appeared Bradford J. Cytron, to me personally known, who, being duly sworn, did say that he is the Sole Member of Cytron Management, LLC, a Missouri limited liability company, which in turn is the Manager of Fairview Hospitality, LLC, a Missouri limited liability company, and that said instrument was signed in behalf of said company, by authority of its Members; as the free act and deed of Fairview Hospitality, LLC.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my office seal in the County and State aforesaid, the day and year first above written.

_Juanita M. Koen_
Notary Public

> Juanita M. Koen
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: July 6, 2013
> Commission # 09832821

STATE OF MISSOURI    )
                         ) SS

COUNTY OF S~~T. LOUIS~~  ) ST. CHARLES

On this ___9___ day of ___MAY___, 2011, before me appeared Larry W. Hasselfeld, to me personally known, who, being duly sworn, did say that he is the Senior Vice President of Drury Development Corporation, a Missouri corporation, which in turn is the Sole Member and Manager of FVH Acquisition, LLC and that said instrument was signed in behalf of said company, by authority of its Members; as the free act and deed of FVH Acquisition, LLC.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my office seal in the County and State aforesaid, the day and year first above written.

> CHERYL ANN KERN
> Notary Public - Notary Seal
> State of Missouri
> Commissioned for St. Louis City
> My Commission Expires: April 28, 2013
> Commission Number: 09504650

_Cheryl Ann Kern_
Notary Public

Send subsequent tax bills to:
FVH Acquisition, LLC
721 Emerson Road, Suite 200
St. Louis, MO 63141

After recording return to:
Lisa S. Leary
FVH Acquisition, LLC
721 Emerson Road, Suite 200
St. Louis, MO 63141

3

## EXHIBIT A

### Legal Description

Permanent Index Numbers (P.I.N.):  03-22.0-300-009 and 03-22.0-300-010

Property Address:  6900 N. Illinois Street, Fairview Heights, IL  62208

Legal Description of Land Encumbered by Mortgage and Assignment of Leases

Part of the Southwest Quarter of Section 22, Township 2 North, Range 8 West of the Third Principal Meridian in St. Clair County, Illinois, being all part of said Southwest Quarter bounded by the Highway right of way lines of Ramp "C" of F.A.I. 64, S.B.I. 159 (F.A. Rte 50), and Frontage Road "D" of F.A.I. 64 and more particularly described as follows:

Commencing at a point which is 140.08 feet right of Station 45+00.55 of centerline of S.B.I. 159 (F.A. 50) as shown on the plat of said road and recorded in the Recorder's Office of St. Clair County, Illinois in Book of Plats "64" on page 120 and 35.00 feet right of Station 99+88.64 of centerline of Frontage Road "D" as shown on said plat, this being the point of beginning, thence North 89 degrees 32 minutes 15 seconds East along the South right of way line of said right of way line of said Frontage Road "D" a distance of 155.00 feet, thence continuing along the last described course a distance of 15.73 feet, thence along the arc of a circular curve to the right having a radius of 325.00 feet, an arc length of 484.70 feet and a chord that bears South 47 degrees 44 minutes 15 seconds East a distance of 441.01 feet, thence South 05 degrees 00 minutes 45 seconds East, a distance of 291.35 feet, thence South 84 degrees 59 minutes 44 seconds West, a distance of 85.87 feet; thence North 39 degrees 31 minutes 32 seconds West, a distance of 109.45 feet, thence South 50 degrees 25 minutes 18 seconds west, a distance of 20.00 feet; thence North 56 degrees 38 minutes 09 seconds West, a distance of 129.34 feet; thence North 64 degrees 46 minutes 23 seconds West, a distance of 244.03 feet; thence North 04 degrees 03 minutes 02 seconds West, a distance of 185.52 feet; thence North 03 degrees 34 minutes 33 seconds West, a distance of 161.38 feet to the point of beginning.

Except the coal underlying the surface of said land and all rights and easements in favor of the estate of said coal.

And further excepting the oil underlying the surface of that part of the premises which was conveyed by Donald G. Soffer and Pearl Soffer, his wife, to Chicago Title and Trust Company, as Trustee under the provisions of a trust agreement dated November 9, 1978 and known as Trust No. 1073597 in a Warranty Deed dated November 8, 1978 and recorded November 9, 1978 in Book 2454 Page 1491.

Situated in the County of St. Clair and the State of Illinois.



**Legal Description**

Permanent Index Numbers (P.I.N.):  03-22.0-300-009 and 03-22.0-300-010

Property Address:  6900 N. Illinois Street, Fairview Heights, IL  62208

Legal Description of Land Encumbered by Mortgage and Assignment of Leases

Part of the Southwest Quarter of Section 22, Township 2 North, Range 8 West of the Third Principal Meridian in St. Clair County, Illinois, being all part of said Southwest Quarter bounded by the Highway right of way lines of Ramp "C" of F.A.I. 64, S.B.I. 159 (F.A. Rte 50), and Frontage Road "D" of F.A.I. 64 and more particularly described as follows:

Commencing at a point which is 140.08 feet right of Station 45+00.55 of centerline of S.B.I. 159 (F.A. 50) as shown on the plat of said road and recorded in the Recorder's Office of St. Clair County, Illinois in Book of Plats "64" on page 120 and 35.00 feet right of Station 99+88.64 of centerline of Frontage Road "D" as shown on said plat, this being the point of beginning, thence North 89 degrees 32 minutes 15 seconds East along the South right of way line of said right of way line of said Frontage Road "D" a distance of 155.00 feet, thence continuing along the last described course a distance of 15.73 feet, thence along the arc of a circular curve to the right having a radius of 325.00 feet, an arc length of 484.70 feet and a chord that bears South 47 degrees 44 minutes 15 seconds East a distance of 441.01 feet, thence South 05 degrees 00 minutes 45 seconds East, a distance of 291.35 feet, thence South 84 degrees 59 minutes 44 seconds West, a distance of 85.87 feet; thence North 39 degrees 31 minutes 32 seconds West, a distance of 109.45 feet, thence South 50 degrees 25 minutes 18 seconds west, a distance of 20.00 feet; thence North 56 degrees 38 minutes 09 seconds West, a distance of 129.34 feet; thence North 64 degrees 46 minutes 23 seconds West, a distance of 244.03 feet; thence North 04 degrees 03 minutes 02 seconds West, a distance of 185.52 feet; thence North 03 degrees 34 minutes 33 seconds West, a distance of 161.38 feet to the point of beginning.

Except the coal underlying the surface of said land and all rights and easements in favor of the estate of said coal.

And further excepting the oil underlying the surface of that part of the premises which was conveyed by Donald G. Soffer and Pearl Soffer, his wife, to Chicago Title and Trust Company, as Trustee under the provisions of a trust agreement dated November 9, 1978 and known as Trust No. 1073597 in a Warranty Deed dated November 8, 1978 and recorded November 9, 1978 in Book 2454 Page 1491.

Situated in the County of St. Clair and the State of Illinois.